WALLACE *v.* THE STATE.

No. 8957.   August 13, 1932.

*E. R. King* and *H. A. Wilkinson,* for plaintiff in error.

*George M. Napier, attorney-general, B. T. Castellow, solicitor-general, T. R. Gress, assistant attorney-general,* and *Bond Almand,* contra.

HILL, J.   The indictment charged that Edd Wallace did kill Morris Rooker by shooting him with a pistol.   The jury returned a verdict of guilty, without a recommendation; and the defendant was accordingly sentenced to be electrocuted.   His motion for new trial was overruled, and he excepted.   There were a number of eye-witnesses to the shooting which occurred at a "Saturday night mullet supper."   According to these witnesses, Morris Rooker had ordered fish and was sitting on a trunk preparing to eat, and Mamie Slater, who the witnesses testified was a concubine of the defendant, was sitting on or standing at the end of the trunk. Morris Johnson testified:   "I was at Will Denson's the night that Edd Wallace is said to have shot Morris Rooker.   When Edd Wallace come in the house Morris Rooker was sitting on a trunk, and Mamie Slater was sitting there by him, and Edd Wallace come in and he started to slapping Mamie Slater, and she run out, and he followed her, and he was gone about twenty minutes and

come back into the room, and Morris Rooker had got off the trunk and was sitting on the foot of the bed, and Edd Wallace commenced slapping him, and Edd Wallace said, 'I told you to stay out of my business,' and Morris Rooker said, 'I haven't been bothering in your business,' and Edd Wallace said, 'You have been bothering with my woman;' and Morris Rooker said no, he had not; and Edd Wallace slapped him again, and Morris Rooker run into him and Edd Wallace shot him. Morris Rooker lived until about the next morning after Edd Wallace shot him. I am no kin to either of them." Will Denson testified: "I know Edd Wallace. I knew Morris Rooker in his lifetime. I am no kin to either of them. A supper was given at my house that night that Morris Rooker was shot and killed. I saw Edd Wallace strike Mamie Slater. When Edd Wallace first come there he walked in. I didn't know it until Mamie hollered and he started to slapping her, and she run out of the door and he followed her, and finally he come back in there and slapped Morris Rooker in the face with his left hand and threw his pistol in his face with his right hand, and Edd Wallace said: 'Didn't I tell you to keep out of my business?' and Morris Rooker said: 'I am not in your business;' and Edd Wallace said again: 'Didn't I tell you to stay out of my business?' and Morris Rooker said: 'I haven't been in your business;' and Edd Wallace walked up to him and slapped him with his left hand and threw his pistol in his face with his right hand, and said, 'God damn you, I will kill you;' and about that time Morris Rooker run into him and said: 'I haven't got nothing; I am not bothering you;' and Edd Wallace kept slapping him and gave him three slaps, and Morris Rooker run into him, and as Edd Wallace was going down he shot Morris Rooker and the ball went through the foot of the bed. The ball struck Morris Rooker, the ball went through the foot of the bed, and the next morning we found the ball. That is the ball, and I found it right there, and I begged him not to have any fuss and let the man alone; but he run over me any way and shot that man, and the man was telling him, 'I am not bothering you.' . . I have seen that pistol before. This is an automatic pistol that Edd Wallace had in Morris Rooker's face. That is the pistol that Edd Wallace shot Morris Rooker with."

There were many other witnesses for the State, who testified substantially as quoted above. The defendant offered no testimony.

In his statement his version of the affair coincided with the witnesses for the State, except that he stated, when he told the deceased to "stay out of his business," the deceased knocked him down, and he reached for his pistol, and in the scuffle the pistol was fired. The defendant also denied that he shot the deceased.

As one of the grounds of the motion for new trial complains that there was no evidence to authorize the charge on the subject of dying declarations, we deem it proper to set out the evidence of J. M. Culpepper, who testified: "I knew Morris Rooker in his lifetime. I saw Morris Rooker after he was shot. How I happened to be out there was, I was at the drug-store, and Dr. Wimberly asked me to ride out there with him, and when we got there Morris Rooker reached out his hand, and I asked him what was the matter, and he said that Edd Wallace shot him. He said that he was going to die. That is about all that he said. I don't remember that he said anything else, but he pulled the cover back and showed me where the ball went in and come out. The ball went in his right breast, and come out on the left breast. That was on Sunday morning. He was living when I left there. I asked Morris Rooker what Edd Wallace shot him about, and he said, 'Nothing.'"

The jury were authorized to find the defendant guilty.

A ground of the motion for new trial complains of the following charge by the court to the jury: "Certain statements purporting to have been made by the deceased, Morris Rooker, as offered by the State as his dying declarations, were admitted by the court. These statements were offered primarily to the court, and the court has admitted them to the consideration of the jury, and at last it is for the jury to determine whether such statements were in fact made, and, if made, were in fact a dying declaration made by the deceased within the meaning of the section of the Code which the court has just read to you. Before you would be authorized to treat the alleged statement purporting to have been made by the deceased as a dying declaration, you must be satisfied that at the time said statement was made that the deceased was in extremis, that is to say that he was in a dying condition, and that he was conscious of his condition and then made such statement in contemplation of approaching death. If you believe such to be true, then you would be authorized to treat it as a dying declaration and give it just such weight as in your opinion it is entitled to." The

error assigned is that there is no evidence to sustain the charge; that there is no evidence authorizing the conclusion that the deceased was conscious of his condition at the time of the declaration. The charge is not attacked as an incorrect statement of the law; and it will be observed, from the evidence set out above, that the charge was authorized by the evidence. It is also alleged that the court erred in not charging, in connection with the foregoing excerpt: "That, in determining the probative value of a dying declaration, the circumstances under which the statements were made may be considered with a view of ascertaining whether the deceased at the time of his alleged dying declaration knew the fact related by him, or was only stating conclusions from facts which may or may not have rested in his knowledge, and whether the physical condition of the declarant and the circumstances of violence and surprise were calculated to impair his powers of observation or his memory." And, "They must consider whether the declarant's account of the occasion was influenced by resentment, and therefore was biased and incomplete." In the light of the evidence the court did not err in the charge as given, for any reason assigned. There was no request made to charge as suggested; and in the absence of a request to elaborate the charge on the subject of dying declarations, the charge as given was ample to cover this phase of the case.

It is further contended that the court in this connection further charged: "That when a statement is offered in evidence as the dying declaration of the deceased, the opposite party has a right to show, if he can, that no statement or statements were made by the deceased relative to the cause of his death, and that one was made contrary to that offered as a dying declaration, and when such a contradictory statement is made or is proved to have been made, the jury should take it into consideration in connection with what purports to be the dying declaration, and consider them together in determining the value of what purports to be the dying declaration." It is contended this charge was error, because it was unauthorized by the law or the evidence; that it contains a negative pregnant; and that in terms it calls the jury's attention to the fact that the defendant's failure to disprove the statement made or alleged to have been made as a dying declaration ought to be by them considered as an element of value in passing upon the dying declaration. Even if there was no contradictory statement of the

alleged dying declaration in evidence, the charge was not such as to require the grant of a new trial.

■ It is insisted that the court erred in charging, on the question of murder and voluntary manslaughter, as follows: "Under the issues presented in this case, the court does not deem it necessary to charge you the law on involuntary manslaughter; but the court will charge you the law on voluntary manslaughter and the court will define to you voluntary manslaughter." It is not contended that involuntary manslaughter was involved in the case, and this reference to that subject by the court in his charge will not require the grant of a new trial.

The court did not err in overruling the motion for new trial.

*Judgment affirmed. All the Justices concur.*